HOTEL MARKHAM, INC., *et al. v.* PATTERSON.

(Division A.   Oct. 20, 1947.)

[32 So. (2d) 255.   No. 36510.]

**Gaston H. Hewes** and **Wallace, Greaves & Wallace**, all of Gulfport, for appellants.

Barnett, Barnett & Jones, of Jackson, and **Bidwell Adam**, of Gulfport, for appellee.

456

**Roberds, J.,** delivered the opinion of the court.

Patterson sued appellants for damages, actual and punitive, resulting from the alleged wrongful act of appellants in changing the lock upon, and renting to another, and thereby depriving Patterson of the use of, a certain barber shop which was being operated by Patterson located in the Markham Hotel. The verdict of the

jury awarded Patterson his barber tools and supplies and $500 money damage.

Appellants changed the lock and rented the barber shop to another without notice to, or the consent of, Patterson. Appellants say they had a legal right to do that; that the relation between them and Patterson was one of licensor and licensee and not that of landlord and tenant; that no notice to, or consent of, Patterson was required; that they had the right to terminate the relation and take charge at pleasure. The facts on which the relation is based were as follows: The shop is operated in a room which is a part of the Markham Hotel. The Hotel acquired the property in February, 1943. It appears the shop was then closed and had not been operated for some time. It remained closed until early in August, 1943. At that time, appellants had an oral agreement with Patterson under which he was to operate the shop. The Hotel owned considerable equipment then in the shop, such as barber chairs, shelves, etc., together with a supply of tonics and lotions. It was agreed that Patterson could operate the shop for a time without charge to determine whether the income therefrom would justify its operation. He did that from early in August, 1943, to September 28th thereafter. The understanding was that beginning September 28th, Patterson would pay $7 per week, which was about the cost to the Hotel of lights, water, etc., used in the shop. He had his own personal barber tools, such as razors, clippers, shears, shaving brushes, etc., which he brought into the shop. It was further agreed that he would keep the shop open from 9 a. m. to 6 p. m. on weekdays, with the privilege of remaining open, at his discretion, on Sunday. He served at this shop the guests of the Hotel, and the general public, as they desired to patronize it. It was important to the Hotel to have a barber shop in its building for the convenience of its patrons. The Hotel consisted of 200 rooms. Fagan, the manager of the Hotel, testified, in effect, that he was to have control of the shop. However,

Patterson denied that. Patterson had the keys to the shop, opened and closed it. Fagan had no keys to it. Patterson made his own charges for his work. He took possession of the shop and the fixtures and equipment therein belonging to the Hotel, using also his own barber tools and equipment in his work. He remained in the shop under that arrangement until March 9, 1946. A part of that time he engaged one or two other barbers to assist him. Fagan testified these were subject to his approval; Patterson contended otherwise. It is seen, then, Patterson had charge and possession of the premises, paying for the use thereof, with certain equipment, $7 per week, and the only restriction on such use seems to have been that he keep the shop open each week-day from 9 a. m. to 6 p. m. He had exclusive possession and means of entrance and made his own charges for his work. For his weekly payments he was given receipts. Most of these receipts described the payment as being for rent of the barber shop. The receipt of June 10, 1944, is an example. It reads "Barber shop rent for 6/8/44."

Was Patterson a tenant or a licensee? The reporter deduced from the opinion in Baseball Pub. Company v. Burton, 302 Mass. 54, 18 N. E. (2d) 362, 119 A. L. R. 1518, this rule as showing the distinction between a lease and a license: "The distinction between a lease of land and a license is that a lease conveys an interest in land, requires a writing to comply with the statute of frauds, and transfers possession, while a license merely excuses acts done by one on land in possession of another that without the license would be a trespass, and conveys no interest in the land . . ." In 32 A. J. 30, Sec. 5, a license is defined to be an authority to do some act or a series of acts on the land of another without passing an estate in the land. It amounts to nothing more than an excuse for the act, which would otherwise be a trespass. A leasehold is an interest in real property; it carries a present interest and estate in the land and the main criterion is the right of possession of the land. Patter-

son, upon payment of the rent, was entitled to possession of the premises. He did have possession and the exclusive means of lawful entry to the shop. The acts performed by him upon the premises were not sporatic; they were constant and continuous and constituted a business. The relation of landlord and tenant existed between the parties.

The trial court instructed the jury it might impose punitive damages on defendants. It is evident the jury did that. Appellants say it was error to permit that to be done. These are the facts bearing upon that question: Patterson operated the shop under the above arrangement from August, 1943, to March 9, 1946. During this time, according to the testimony of Fagan, the manager of the Hotel, he had not been constant in keeping the shop open, and while in and about the lobby of the Hotel, but not in the shop, whiskey had been detected upon his breath, which was disagreeable to some of the guests of the Hotel. Also, on February 3, 1945, without the knowledge of the Hotel, he had entered into a written contract of equal partnership in the operation of the barber shop with one John O. Davis. However, this contract was not put into force because Davis did not pay the full consideration named therein. On March 9, 1946, which was Saturday, Patterson, without notice to the Hotel, left the City and did not return until Monday afternoon. The Hotel did not know the whereabouts of Patterson. The shop remained closed all day Saturday and until around noon the following Monday. About noon Monday, Fagan arranged with one Stalone to open the shop and to occupy and operate it thereafter. Having no key to the shop, Fagan had the lock on the shop door removed and another placed thereon, delivering to Stalone a key thereto. Stalone was operating the shop when Patterson returned Monday. All of this was without actual or statutory notice to Patterson. Sec. 946, Code 1942. It might be added that it appears certain that Patterson was behind with his rent. It should also be said that there is

no evidence that Fagan had any ill will towards Patterson, and that he was acting in perfectly good faith to protect the interest of the Hotel. But for the case of Lay v. Great Southern Lumber Co., 118 Miss. 636, 79 So. 822, the writer would say no punitive damages could be imposed herein. However, we are unable to distinguish that case from this, and, unless and until overruled, it is binding upon us.

But the case must be reversed and remanded because of the confused condition of the record, and the weight of the evidence on the charge that defendants wrongfully took and retained possession of barber tools, the personal property of plaintiff, which were in the shop at the time defendants placed Stalone in charge.

As to the confused condition of the record, it is not clear whether the effort was to recover value of such tools on the ground of conversion or damages resulting from their wrongful detention. In one place in the declaration, it is alleged that Fagan gave Patterson to "understand that everything in said barber shop that plaintiff had left in said barber shop should not (be) recovered or attempted to be recovered by said plaintiff." In another place, he charged that because of the wrongful ejection from the shop he was caused "to lose his tools and equipment hereinabove stated and described  .  .  ." He testified to the difficulty of getting work as a barber, his loss of time and consequent damage because he did not have his barber tools. He also stated that they were worth from $400 to $600. He then itemized the articles and placed a separate value on each. He obtained this instruction to the jury: "The Court instructs the jury for the Plaintiff, that if the jury believe from a preponderance of the evidence in this case that the plaintiff has lost any tools or other barber equipment belonging to the plaintiff, by reason and on account of the defendants taking charge of the barber shop and placing another person in charge of same, if the defendants did so, and if the jury further believe from a preponderance of the evidence

that the plaintiff did not consent or agree to being relieved of or dispossessed from said barber shop by the defendants, then the jury shall find for the plaintiff in such sum and amount as the jury may believe from the evidence will reasonably and fairly compensate the plaintiff for the loss of such tools or barber equipment, if any loss there was sustained by the plaintiff.'' In his brief he says ''The actual damages alledged by the appellee consisted of $48.00 in loss of time, and $600.00 for the loss of tools,'' conveying the idea no damage was asked for wrongful ejection from the building. In another place in the brief he says ''The jury returned a verdict in the sum of $500 for tools and supplies belonging to appellee. Judgment was rendered for this amount,'' presumably assuming no damage was given for loss of business, or other damage, resulting from his dispossession of the building. In another place in his brief, as an argument against the contention of appellants that the amount of the verdict was excessive, he set out the articles of personal property, with the value of each, as given by Patterson in his testimony, totaling $219, and then says ''By simple addition it can be seen that the six days' work and the articles amounted to $267.00. The verdict of the jury was for $500.00, and by subtracting $267.00 from $500.00 it will readily be seen that it leaves a balance of $233.00, which the jury undoubtedly found to be the value of the plaintiff's business.'' Now, the verdict of the jury was in these words: ''We the jury find for the plaintiff in the sum of $500.00, tools & supplies belong to the plaintiff.''

It is stated in a brief, and not denied, that immediately after the trial Patterson took possession of all the barber tools and supplies. It is thus seen that if the suit is for damages resulting merely from the wrongful taking and detention of the tools—that is, the value of the use of the tools and damage from inability to procure work because of their detention—much, if not all, of the testimony of the intrinsic value of the articles was incompetent and misleading. If the suit was for conversion of the

articles, the jury should have included their value in its money award; whereupon the tools themselves would have become the property of defendants. But the verdict gave the tools to Patterson, and he took possession of them after the trial. In other words, according to Patterson, the jury awarded him the value of the tools and also gave him the tools. If the plaintiff himself is confused by all of this, it is easily understood the jury must have been more so. Confusion alone might not be enough to work a reversal of the case but here it is affirmatively shown that such confusion resulted in grave injustice to appellants. They were required to pay for the tools and yet the tools themselves were awarded the plaintiff.

As to the testimony on the issue whether defendants took charge of the tools and supplies and deprived Patterson of their possession, we think the great weight of the evidence is to the effect that they did not do so, and that this question should be passed upon by another jury, especially in view of the confused condition of the record as shown above. Patterson, referring to his conversation with Fagan, said "and I asked him about my stuff, and he said he took charge of that too and for me to stay out." Q. "Did he offer to give you your tools?" A. "He didn't say anything about it." Again, "I asked him about my stuff, and he told me that he took charge." That was the testimony, in substance, on behalf of the plaintiff. For the defendants, Fagan said he never took charge of the tools; that he never told Patterson he had done so; that they were in the shop and he told Stalone to deliver them to Patterson when he came for them. Stalone said Fagan told him that. He also said Patterson came in the shop after the conversation with Fagan and he, Stalone, informed him he could get the tools, and Patterson said he would come back the next morning and get them. Patterson admitted that he went back into the shop after his conversation with Fagan, but says not a word was spoken between himself and Stalone, a possible but unlikely thing to happen. But the actions of Fagan and

Stalone speak louder than their words. It is not in controversy that Stalone got all of Patterson's barber tools and supplies together, separated them from everything else in the shop, and placed them to one side, no one used them, and during all the time from that date to the time of the trial, Patterson could have gotten them for the asking or by replevin, with damages. They were intact at the time of the trial and he did get them immediately afterwards.

Reversed and remanded.