Louis Talbert, Plaintiff and Appellee, v. Hilton Hotels International, Inc., Defendant and Appellant.

No. 11502. Argued April 11, 1955.—Decided May 11, 1955.

McConnell, Valdés & Kelly and A. Castro Fernández for appellant. Luis E. Dubón and R. García Cintrón for appellee.

Mr. Chief Justice Snyder delivered the opinion of the Court.

Hilton Hotels International, Inc., hereinafter referred to as Hilton, operates the Caribe Hilton Hotel at San Juan under a contract of lease with the Puerto Rico Industrial Development Company. On January 1, 1952 Hilton made a "Concession Contract" with Louis Talbert whereby the latter would operate for a period of two years a men's apparel shop in a certain location on the premises of the hotel. A Supplemental Agreement, dated October 26, 1953, provided that the contract shall expire on November 30, 1954

unless renewed by mutual agreement. On July 20, 1954 Hilton wrote Talbert that it did not intend to renew the contract and requested him to vacate the premises.

On September 21, 1954 Talbert sued Hilton in the Superior Court praying for (1) a declaratory judgment that although the contract was due to expire on November 30, 1954, it must nevertheless be ". . . compulsorily extended . . ." at Talbert's option by virtue of § 12 of the Reasonable Rents Act, and (2) preliminary and permanent injunctions to prevent Hilton or its employees from disturbing him in the possession and use of the shop. Talbert attached to his complaint as exhibits the Concession Contract, the Supplemental Agreement, and the correspondence between the parties with reference to termination of the agreement.

Talbert also filed a separate petition for a preliminary injunction to the same effect. Hilton filed an answer in opposition to the petition for a preliminary injunction. Hilton attached to this answer as exhibits (1) a copy of a Concession Agreement, dated August 4, 1954, between Hilton and a new concessionaire for operation by the latter of the men's apparel shop involved herein beginning on December 1, 1954 and ending September 30, 1956 with terms substantially similar to those in the Concession Contract between Hilton and Talbert, and (2) a copy of a letter dated October 22, 1954 from the Chief of the Legal Division of the Office of Economic Stabilization of Puerto Rico in which the latter, replying to a letter of October 18, 1954 from Hilton, concluded that ". . . the relation between Louis Talbert, as tenant, and Hilton Hotel Corporation is not covered by the Reasonable Rents Act under the exception in Section 4 of the said Act . . .". In the light of the petition for a preliminary injunction, the answer thereto, and the exhibits attached to both, the Superior Court, after hearing the parties, entered an order granting a preliminary injunction as prayed for by Talbert. Hilton appealed from this order.

The contentions of the parties make it desirable to summarize the terms of their contract. The preliminary, explanatory portion of the agreement provides that it is a Concession Contract between Hilton and Louis Talbert, doing business as Timothy Talbert Shop, and described as "the concessionaire". It goes on to state "[t]hat a shop for the sale of men's apparel is being presently operated on the hotel premises . . . *for the convenience of guests,* and that Hilton and the concessionaire have agreed that as of January 1, 1952, the concessionaire will undertake the operation of the said shop . . ." (Italics ours).

Par. 1-A provides that Talbert will furnish ". . . all of the supervision, labor, and material necessary to operate upon the premises of the hotel, and in the space hereinafter mentioned, a shop for the sale of highest quality men's apparel. *Such shop shall be operated in conformity with standards set up by Hilton for the operation of the hotel,* and shall have available for sale men's wear of the type and quality customarily available for sale at the better shops in New York City, New York (such as Brooks Brothers and A. Sulka and Co.)." (Italics ours). In addition to this description of what Talbert may sell in his shop, par. 1-A lists the products Talbert may not sell: perfume, precious jewelry, sporting goods, and items customarily handled by the gift shop or the combined news and drug stand. And in par. 1-B Hilton agrees not to permit the sale of men's apparel in any other shop in the hotel.

Par. 2 provides that the agreement shall be for a period of two years, commencing on January 1, 1952, and may be extended for an additional two years provided: ". . . a mutually satisfactory agreement shall have been reached as provided in Clause 3 hereof." [1]

---

[1] There is apparently a typographical error in the record before us as to the date of termination of the Concession Contract, which is given as December 31, 1954. But as a two-year arrangement it expired on

Par. 3 provides that Talbert shall pay Hilton annually (1) either 10 per cent of the first $40,000 of his annual gross sales plus 5 per cent of his annual gross sales in excess of $40,000, or (2) $2,700, whichever is greater, "[a]s compensation for the privileges herein granted . . . ". As Hilton points out in its brief, the contract at no point refers to this compensation as "rent".

Par. 4 prohibits Talbert from assigning the agreement without Hilton's consent and provides that Talbert shall *personally* supervise the performance of the obligations undertaken by him under the contract. Par. 5 provides that the name of the shop must be approved in writing by Hilton and shall be the property of Hilton except that "[i]f the concessionaire elects to use the name 'Timothy Talbert Shop', approval by Hilton shall not be required and such name shall remain the property of the concessionaire." Par. 6 provides that the employees of the concessionaire shall be acceptable to Hilton.

Par. 7-A provides that Hilton may from time to time inspect the shop, the services rendered to customers, and Talbert's books and records.

Par. 8 provides: "Hilton will continue to make available to the concessionaire the premises presently occupied by the shop, and will, from time to time, as the needs of the concessionaire's business may require, furnish the concessionaire storage space on the hotel premises; but shall not be obligated to furnish more than 200 square feet of storage space at any one time. Hilton will furnish, without additional cost to the concessionaire, the electricity and water required for the operation of the shop; and will perform all painting and will make all structural repairs to the shop at its own cost and expenses. In the event that the commercial area in the hotel premises should be reconstructed or revised during the

December 31, 1953. Shortly prior to the latter date, on October 26, 1953, the parties executed the Supplemental Agreement extending their contract until November 30, 1954.

term of this agreement, Hilton will furnish to the concessionaire suitable space in such reconstructed or revised commercial area."

Par. 9 provides for payment to Hilton by Talbert of $1,100 in $100 monthly installments for the cost of installation by Hilton of ". . . customary wood and glass fixtures, which are and shall remain the property of Hilton". Par. 10 provides that the expenses for the operation and maintenance of the shop are for the account of the concessionaire; par. 11 requires Talbert to obtain all licenses and pay all taxes for operation of the shop; par. 12 provides that all risks in connection with the operation of the shop, including workmen's compensation, personal injuries and fire, shall be assumed by Talbert.

Par. 13 reads as follows: "The decorative scheme of the shop shall be subject to the approval of Hilton. The concessionaire shall make no changes in the decorative scheme without the prior written approval of Hilton; nor shall the concessionaire be entitled to install any signs or other advertising matter on the hotel premises, either within or without the shop, without the prior written approval of Hilton."

Par. 14 provides in part as follows: "If the concessionaire so desires, Hilton will bill guests of the hotel for merchandises purchased at the shop but Hilton shall not be responsible to the concessionaire for any loss resulting from failure to collect any such account. Hilton shall not be responsible for the collection of any disputed account."

Par. 15 reserves to both parties the option to terminate the contract in the event of insolvency, bankruptcy or receivership of the other party.

Paragraphs 16, 17, and 18 read as follows:

"16.—*This being a contract for the personal services and skill of the concessionaire in the conduct and operation of the shop,* it is agreed that Hilton may terminate this agreement at any time that it should be determined that the concessionaire is failing to operate the shop in conformity with the standards set

up by Hilton for the operation of the hotel and/or is failing to comply with any one or more of the terms and provisions of this agreement; provided, however, that prior to terminating this agreement, Hilton shall give the concessionaire notice in writing of the deficiency or default and thirty days within which to correct such deficiency or default. Termination pursuant to paragraph 15 of this agreement may be effected by notice in writing and shall become effective at the time notice of termination is given.

"17.—*In case of any termination of this agreement by Hilton, with or without justification, it is agreed that the concessionaire will forthwith remove and/or cause the removal of, all of his property from the shop, and will forthwith surrender possession thereof to Hilton,* hereby waiving and renouncing any right which he might otherwise have to remain in possession thereof and to continue the business of the shop until final determination as to whether such termination by Hilton was proper or improper. The surrender by the concessionaire of the shop to Hilton in such case shall not be deemed to constitute an admission by the concessionaire that the shop was not being conducted in accordance with the terms and provisions of this agreement, or that the concessionaire was in default in the performance of any of the terms and provisions hereof. *It is understood and agreed, however, that the sole remedy of the concessionaire, if he should deem that Hilton may have terminated this agreement improperly or without justification, shall be by action to recover such damage as the concessionaire may deem himself entitled.*

"In case of termination for any reason, if the concessionaire should fail or refuse to remove his property from the shop, Hilton shall be entitled to cause the same to be removed and stored for account of and at the risk of the concessionaire; and in such event, Hilton shall not be liable to the concessionaire for any damage or injury suffered by reason of such removal or storage of the concessionaire's property.

"18.—*This agreement shall not be deemed to be a lease or sublease of any portion of the hotel premises, but a contract for the performance by the concessionaire of certain services deemed necessary and/or convenient for the comfort and entertainment of guests of the hotel, which services the concessionaire is peculiarly qualified to perform* and the concessionaire hereby

expressly recognizes and agrees that he is not entitled to the benefit of the provisions of Act No. 464 of the Legislature of Puerto Rico, approved April 23, 1947, [2] known as the 'Reasonable Rents Act', as subsequently amended, or to the benefit of any other statute which is now or may hereafter be of application to the rights of lessees of real property." (Italics ours).

Par. 21 provides for the payment of $5 a month for " . . . the cost of installation and operation of the system of air conditioning installed in connection with the shop premises."

In the first paragraph of the Supplemental Agreement of October 26, 1953 the parties modified the original contract by extending it until November 30, 1954. The second paragraph provides in part that "[f] rom and after the first day of January, 1954, the compensation payable to Hilton by the concessionaire for the privilege granted in the basic agreement, shall be a sum equal to ten (10) per centum of the gross sales of the shop, or the sum of $225 per month, whichever is greater." [3]

The Supplemental Agreement also provided that: " . . . each party shall notify the other, on or before the first day of September, 1954, of his willingness or unwillingness to consider a further extension of the basic agreement. Such notice shall not be binding on either party, and neither party giving a notice of his willingness to extend the agreement shall be in any way bound to do so, it being the intent of the parties that such notice shall serve merely as a guide to enable the parties to prepare either for an extension of the agreement, or for its termination."

---

[2] The Reasonable Rents Act is Act No. 464, Laws of Puerto Rico, 1946.

[3] Later in the second paragraph the monthly payment is referred to as being $285. This seems to be another typographical error in the record before us. The original Concession Contract provided for an annual payment of $2,700—that is, $225 a month—and the only change in the Supplemental Agreement as to compensation apparently was in the percentum of the gross sales to be paid to Hilton if it were in excess of the monthly payments.

## I

■ Section 12 of the Reasonable Rents Act provides that when a lease contract of commercial premises expires, it shall be ". . . compulsorily extended . . ." at the option of the lessee.[4] The Superior Court held that the Concession Contract herein is a lease contract of commercial premises; that consequently it was ". . . compulsorily extended . . ." under § 12 when Talbert exercised his option to remain in possession of the shop at the expiration of the contract; and that Talbert was entitled to a preliminary injunction to prevent Hilton from disturbing him in the possession and use of the shop.

Hilton attacks this holding. It argues that § 12 is not applicable to this case on the ground that the Concession Contract is not a lease. Rather, according to Hilton, the contract is for personal services which incidentally require use of the premises in question. In support of this argument, Hilton relies on a number of the provisions of the contract.

Hilton begins by calling attention to the fact that the contract is not couched in terms of "lease" and "rent", which are normally used in lease contracts. On the contrary, the parties expressly agreed that the contract would be for personal services. Hilton concedes that the label attached to a contract is not controlling if its terms dictate a different result, see *Vélez* v. *San Miguel*, 68 P.R.R. 534; but, citing *Mejías, Administrator* v. *Superior Court*, 75 P.R.R. 419, 491, Hilton argues that what the parties called their contract plays a large role here, particularly in the light of the other provisions of the contract.

Hilton goes on to contend as follows: The principal object of the contract was not the collection of rent. It was to render services to the guests of the hotel by giving Talbert

---

[4] Act No. 464, Laws of Puerto Rico, 1946, as amended by Act No. 201, Laws of Puerto Rico, 1948; 17 L.P.R.A. § 192.

access to them. Hilton is operating a large and modern tourist hotel in which it must furnish various services, including a men's apparel shop, which its exacting guests require. In arranging for Talbert to render these services insofar as men's apparel is concerned, Hilton was not interested merely in renting premises which are "in the heart of the hotel itself" for a stipulated rent; it would have taken such action only if it were dedicated to the business of renting space and were interested only in receiving rent. Hilton does not confine itself to furnishing an empty location; it supplies Talbert with his clientele for whom Talbert in turn contracts with the hotel to furnish adequate services.

Hilton asserts that, in offering a large number of desirable customers concentrated in a single place to Talbert and other concessionaires similarly situated, it in effect said: "We have an ideal clientele concentrated in one building and we wish to give them all types of services, but we prefer to do this through persons specifically qualified therefor. Do you wish to render one of these services, dividing your earnings with us? Naturally, we will need the use of some space in the hotel for the business and we shall supply it, but we shall reserve certain rights and controls over the business, and we make it clear as of now that we are not renting you space." That, Hilton submits, is very different from saying: "I rent you this specific premises for so and so price for such a period of time."

In support of its thesis that this is not a lease, Hilton points out that it has reserved a series of rights and controls over Talbert's business in such matters as the name of the shop, the personnel, supervision, decoration, type of merchandise, etc. According to Hilton, such terms are neither characteristic nor permitted in an ordinary lease.

Par. 8 of the contract provides for a change in the location of the men's shop if the commercial area of the hotel is "reconstructed or revised." According to Hilton, this

demonstrates that the particular place in which the shop is located within the hotel is not important but that the parties were interested only in giving the guests of the hotel access to a men's shop somewhere in the hotel. And such an arrangement, Hilton insists, is not a lease.

Hilton argues that to apply § 12 to the Concession Contract would be to interfere with a personal relationship in which Hilton relies on the capacity, skill, and integrity of the concessionaire who renders at the request of Hilton necessary services within the hotel to the guests; that inadequate services by concessionaires will damage Hilton's reputation, as such deficiencies are attributed by guests to the hotel itself; and that if Hilton is prevented by § 12 from terminating or refusing to renew a concession agreement, it will be compelled to operate the various concessions in the hotel itself, which is undesirable for all concerned.

Hilton argues that under § 1207 of the Civil Code, 1930 ed., the Concession Contract is a valid contract because it is not against public policy and there is nothing in our statutes which prevents recognition of this new and modern type of contract, see *Puerto Rico Auto Corporation* v. *Tax Court*, 77 P.R.R. 105; *Rivera* v. *Díaz*, 70 P.R.R. 168, 187 (concurring opinion). In asserting that the Concession Contract is not a lease to which § 12 applies, Hilton describes it as follows: "In our judgment the said agreement does not constitute a lease although it contains elements of the latter. Rather it is an agreement for personal services in which incidentally a place is used, in which the relationship between the parties, insofar as the place is concerned, is that of 'licensor-licensee', and has some of the characteristics of a joint venture and of a partnership. Actually it is a contract which is *sui generis* and must be accepted, treated and catalogued as such, in order not to frustrate the role it should play in our modern commercial life."

In support of its argument that the Concession Contract

should be treated not as a lease but as a *sui generis* contract or as a "licensor-licensee" relationship, Hilton cites Comments, *Contracts—Agreements for Leasing Departments in Retail Stores*, 35 Mich.L.Rev. 95, 101, 108; 33 Am.Jur. 398; *Hess* v. *Roberts*, 108 N.Y.Supp. 894 (1908) (exclusive privilege of the public stenographer's office in a hotel is not a lease) ; *Planetary Recreations* v. *Kerns, Inc.*, 54 N.Y.S.2d 418 (1945) (cigaret, photography, washroom, and coatroom concession in nightclub is a "license" rather than a "contract for the use or rental of real property") ; *Criterion Concessions* v. *Jelin Productions*, 61 N.Y.S.2d 239 (1946) (privilege to sell edibles and to check clothes in a theatre made plaintiff a concessionaire and not lessee) ; *Halpern* v. *Silver*, 65 N.Y.S.2d 336 (1946) (permission to install and maintain a coin-metered washing machine in a building is a license, not a lease) ; *Kaypar Corporation* v. *Fosterport Realty Corp.*, 69 N.Y.S.2d 313 (1947) (agreement under which plaintiff installed and maintained coin-metered washing machines in the basement of an apartment building did not protect the plaintiff from eviction under the New York Commercial Rent Control Law) ; *Schusterman* v. *C. & F. Caterers*, 77 N.Y.S.2d 718 (1948) (concession to check hats and coats is a license not a lease and is not covered by the New York Emergency Rent Control Law which protects possession of space and not a license to do certain acts on real property) ; *Wash-O-Matic Laundry Co.* v. *621 Lefferts Ave. Corp.*, 82 N.Y.S. 2d 572 (1948) (agreement as to washing machines is a license, not a lease) ; *Layton* v. *A. I. Namm & Sons*, 89 N.Y.S.2d 72 (1949) (agreement whereby optician hired floor space for department of optical goods in a retail store is a license, not a lease) ; *Tel-Hotel Corp.* v. *Lexnott Corp.*, 124 N.Y.S. 2d 159 (1953) (right to install television equipment in hotel rooms is a license rather than a lease.) [5]

---

[5] It should be noted that in some of these New York cases the ques-

On the other hand Talbert, citing *Figueroa* v. *Rodríguez*, 68 P.R.R. 248, argues that under our Civil Code the privilege to use a specific piece of real property for a certain price creates the relationship of landlord and tenant. He asserts that in view of the definition of "a lease of things" in § 1433 of the Civil Code, 1930 ed., and of the broad terms of par. 7 of § 22 of the Reasonable Rents Act, as amended by § 3 of Act No. 201 of 1948, the Concession Contract is covered by the Act.[6] He analyzes the various clauses thereof to demonstrate his argument. He points out, as Hilton concedes, that if the Reasonable Rents Act applies, the clause in the contract exempting it therefrom is void. And he cites *In Re Owl Drug Co.*, 12 F.Supp. 439 (Dist.Ct., Nev., 1935); *Hotel Markham* v. *Patterson*, 32 So.2d 255 (Miss., 1947); and *Shepard Warehouses* v. *Scherman, supra.*

The Superior Court agreed with Talbert. It held that the contract was a lease of a thing, and not of services, as provided in § 1433 of the Civil Code, on the ground that it " . . . granted to the plaintiff for a fixed period and a certain price a specific place to be used for the sale of men's apparel." And, according to the trial court, the rights reserved to Hilton did not alter the nature of the contract.

This is a case of first impression in this jurisdiction. It involves a fairly close question which, as a general proposi-

tion of eviction was not involved; in others, unlike the present case, the "licensee" was not entitled to exclusive possession of specific premises. As to whether the New York courts would oust a defendant who was entitled by his contract as here to exclusive possession of specific premises, *quaere.* *Cf. Shepard Warehouses* v. *Scherman*, 63 N.Y.S.2d 421 (1946), where a "licensee" was considered a "statutory tenant" and therefore protected by the New York rent control statute even though he had only a license rather than a lease to store 14 trucks in a garage at a monthly rate per truck.

[6] Section 1433 reads as follows: "In a lease of things, one of the parties thereto binds himself to give to the other the enjoyment or use of a thing for a specified time and a fixed price."

Par. 7 provides: " 'Contract', 'Lease Contract' and 'Lease' include all lease contracts and all verbal or written agreements by which the owner allows the tenant to use a rental property or a part thereof at a fixed price."

tion, may conceivably call for a different answer in the civil law as against the common law. The cases and textbooks indicate that in the common law the line of demarcation between a lease and a license may become very shadowy.[7] What is more important is that characterizing the Concession Contract herein as either a lease or a "license" may have far-reaching implications in other fields such as tax, tort, and bankruptcy law. Under these circumstances, we prefer to leave open the question of whether the arrangement between Hilton and Talbert, as a matter of general law, constituted a lease in view of the result we reach in Part II of this opinion under the specific terms of the Reasonable Rents Act.[8]

## II

██ Hilton next argues that even assuming the Concession Contract was a lease, § 4 of the Reasonable Rents Act specifically excepts from the Act a lease of premises within the hotel for the operation of such things as a men's apparel shop which serves the guests of the hotel.

Section 4 of Act No. 464 of 1946 originally provided in part as follows: "Neither shall the provisions of this Act

[7] In addition to the authorities cited by the parties in their briefs as to the nature of a license as compared with a lease, see 2 Powell on *Real Property*, pp. 175–7, and cases cited in footnotes 25–31; 3 *ibid.*, pp. 524–5, pp. 514 *et seq.*; I *American Law of Property*, p. 202, pp. 177 *et seq.*; *Pitts* v. *Cincinnati Metropolitan Housing Authority*, 113 N.E.2d 869 (Ohio, 1953); *Taylor* v. *Dean*, 78 A.2d 382 (D.C., 1951); *Kaiser Co.* v. *Reid*, 184 P.2d 879, 885; (Cal., 1947); *Rendall* v. *Pioneer Hotel*, 222 P.2d 986, 989 (Ariz., 1950); *Gerould Co.* v. *Arnold Constable & Co.*, 65 F.2d 444 (C.A. 1, 1933); *Tips* v. *United States*, 70 F.2d 525 (C.A. 5, 1934); *Beckett* v. *City of Paris Dry Goods Co.*, 96 P.2d 122 (Cal., 1939); 51 C.J.S. 513. *Cf. Galiñanes Hnos., Inc.* v. *Superior Court*, 77 P.R.R. 836.

[8] Although § 12 does not explicitly so provide, we have held that it does not apply to —and therefore does not compulsorily extend— the lease of a going concern, even though the lease incidentally includes the building in which the business is established. *Orsini* v. *Sánchez*, 67 P.R.R. 809; *Ortiz* v. *Cesaní*, 68 P.R.R. 382. *Cf. Heirs of Ramírez* v. *District Court*, 70 P.R.R. 763; *Mejías, Administrator* v. *Superior Court*, *supra*. Hilton argues that we should likewise hold here that when the

be applied to hotels or boarding houses that provide both room and board." This was amended by Act No. 395, Laws of Puerto Rico, 1947, to read as follows: "Neither shall the provisions of this Act be applied to hotels or boarding houses, in so far as concerns the relation between the person operating said hotel or boarding-house business and the guest or tenant thereof." [9]

The Superior Court held that the exception contained in § 4 does not apply to every lease a hotel makes of a portion of its premises; that, on the contrary, this exception applies only to activities which are appropriate to a hotel; and that such appropriate activities are limited to renting rooms or apartments to "guests" who stay in a hotel for short periods of time and to "tenants" who make a hotel—at a lower rate— their permanent residences.[10] The trial court conceded that a tourist hotel could not be operated successfully if persons staying at the hotel—whether short-term "guests" or long-term "tenants"—were protected by the Reasonable Rents Act.[11] But it took the position that a different result was required here on the theory that the Legislative Assembly intended by the exception in § 4 to cover only those activities appropriate to the hotel business and that the operation

Concession Contract was executed a going business existed and that the premises involved were only incidental thereto. Here again, in view of the result we reach in Part II under the terms of the Act, we find it unnecessary to rest our decision on these cases. We therefore do not stop to determine whether the somewhat different facts—including the fact that, instead of leasing a going business from Hilton, Talbert himself originally established this business—would require a different result here.

[9] We have substituted the word "guest" for "lodger" in the English version of § 4, as amended in 1947, as a more appropriate translation, in the context of § 4, of the word "huésped" in the Spanish version.

[10] In support of its distinction between "guests", staying in a hotel for a short period, and "tenants" who stay longer, the trial court cited 18 *Words and Phrases*, Perm. Ed., pp. 849–50, and *Hackett* v. *Bell Operating Co.*, 169 N.Y.Supp. 114, 115 (1918). See also *Hundley* v. *Milner Hotel Management Co.*, 114 F.Supp. 206 (Dist.Ct., Ky., 1953).

[11] We agree. There can be no question of the right of a hotel, if it chooses, to evict forthwith both short-term and long-term guests

of a men's apparel shop was not an appropriate hotel activity. The trial court asserted that the situation here was the same as if the premises had been rented to a doctor; that this would benefit the hotel as an additional service to its guests; but that to except the relationship between the doctor and the hotel from the Reasonable Rents Act would be to deprive the doctor of the protection afforded by the Act to other doctors whose offices were located in other buildings.

The Superior Court undertook to determine for itself the content of the word "tenant" in § 4, as amended in 1947. It concluded that "tenant" was virtually synonymous with "guest", the only difference being that the former was a more or less permanent guest at a lower rate. But when a term is clearly defined in a statute, that definition prevails; it is not for the courts to speculate that the Legislative Assembly may have intended to use the term at one point in the statute in a different or limited sense. 2 Sutherland *Statutory Construction* 3d ed., 222; Crawford, *Statutory Construction*, pp. 361–3; 50 Am. Jur. 254–5; 82 C.J.S. 536–8. In accordance with this general principle, we have held that the definitions of terms found in the Reasonable Rents Act are controlling. *Cintrón* v. *Municipal Court*, 67 P.R.R. 743, 746; *La Costa, Jr.* v. *District Court*, 67 P.R.R. 158; *Mejías, Administrator* v. *Superior Court, supra*, 427.

Accordingly, we turn to the Act and the definitions therein. Section 4, as amended in 1947, excepted from the Act "the relation between the person operating said hotel . . . and the guest or *tenant* thereof." (Italics ours.) What is a "tenant"? That word was defined in § 22 of Act No. 464 of 1946 as follows: " 'Tenant' includes lessee, sublessee, and any natural or artificial person living in, *using, or occupying a rental property.*" (Italics ours.) [12] Talbert himself con-

_____

who attempt to remain in a hotel beyond the date of their reservations. Only in this way can a hotel honor the reservations of incoming guests and thereby maintain its reputation.

[12] Although § 3 of Act No. 201 of 1948 amended § 22 in other respects, it left unchanged the definition of "tenant".

tends that he has a lease of commercial premises.[13]   It therefore seems obvious that under his own theory Talbert is a *tenant* using or occupying rental property as defined in § 22. And § 4 excepts from the Act a "tenant" of a hotel.

Our view is reinforced by the history of the Reasonable Rents Act.   Section 4, as it read originally in 1946, excepted from the Act ". . . hotels or boarding houses *that provide both room and board.*"   (Italics ours.)   This apparently confined the exception to guests.   Section 2 (b) of the Rent Regulation for Commercial Purposes, promulgated on November 1, 1946, was also restricted to guests.   It provided that the Regulation shall not apply to: "Hotels and boarding houses in so far as concerns the relation between the person operating said business and the guests or patrons."   But in 1947 the Legislative Assembly, by amending § 4, broadened the exception to include "tenants" of the hotel.   The provisions of both the 1946 Act and § 2 (b) of the Regulation were therefore superseded as to the question before us. "Tenants" of a hotel, as defined in § 22—which clearly included the lessee of a men's shop catering to the guests— were thereafter excepted from the Act.   While we are of course not bound by the opinion of the Chief of the Legal Division of the Office of Economic Stabilization to this effect, we agree with it.

In order to escape from the inexorable logic of the definition in § 22 as applied to the exception for tenants of hotels in § 4, Talbert argues and the Superior Court agreed that "tenant" in § 4 means only those who are long-term guests in the hotel.   In the first place, the definition in § 22 and the provision in § 4 contains no such restriction.   We find nothing in the definition in § 22 or in § 4 making "guest" and "tenant" virtually synonymous.   It is therefore our

---

[13] Section 22 also provides: "'Rental Property' includes . . . house and building used wholly or partly for business . . . or commercial or industrial purposes."

duty to apply the statute as it is written to a "tenant" of the hotel like Talbert. In the second place, even if the statute confined the exception to tenants in connection with activities appropriate to a hotel, we cannot agree that the operation of this particular men's apparel shop in the Caribe Hilton Hotel is not an appropriate activity of a tourist hotel. On the contrary—even if we call the arrangement between the parties a lease—the Concession Contract shows on its face that both parties wished to offer to the guests of this luxurious tourist hotel the services available in a fashionable men's apparel shop.

Apparently the Superior Court was of the view that a tourist hotel confines its activities to feeding and housing its guests. No tourist hotel would survive very long under any such theory. Hilton, which operates a world-wide chain of hotels, understood this. It was careful to negotiate a contract the terms of which, as summarized above, make it crystal clear that the men's apparel shop was an integral part of the facilities Hilton offered its guests as a tourist hotel. We fail to see by what authority we can by our mere *ipse dixit* vary the terms of the contract to which both Hilton and Talbert specifically agreed and hold that such services are not an appropriate activity of a tourist hotel.[14]

We hold that under § 4 of the Reasonable Rents Act the contract between Hilton and Talbert for the operation by the latter of a men's apparel shop on the premises of the Caribe Hilton Hotel is not covered by the Act and that consequently the said contract is not compulsorily extended at Talbert's option under § 12.[15]

---

[14] Whether the hotel could avail itself of the exception in § 4 to evict a "tenant" of commercial space who had no connection with the furnishing of services which are usually expected by guests of a tourist hotel is not before us and we make no comment thereon. We therefore need not discuss the example of the doctor given in the opinion of the trial court or of any other "tenant" under similar circumstances.

[15] *Mejías, Administrator* v. *Superior Court, supra*, holding that § 4 does not except from the Act a lease of an entire hotel, is of course dis-

288

The order of the Superior Court granting a preliminary injunction in favor of Talbert will be reversed and the case remanded.

tinguishable from the instant case. Our language at p. 427 of the *Mejías* case in connection with § 4 has no relation to the problem here.