LOUIS TALBERT, demandante y apelado, *v.* HILTON HOTELS INTERNATIONAL, INC., demandada y apelante.

Número 11502.
*Sometido:* 11 de abril de 1955. *Resuelto:* 11 de mayo de 1955.

*Mc Connell, Valdéz & Kelly* y *A. Castro Fernández,* abogados de la apelante; *Luis E. Dubón* y *R. García Cintrón,* abogados del apelado.

EL JUEZ PRESIDENTE SEÑOR SNYDER emitió la opinión del Tribunal.

La Hilton Hotels International, Inc., que en adelante llamaremos la Hilton, opera el Hotel Caribe Hilton en San Juan bajo un contrato de arrendamiento celebrado con la Compañía de Fomento Industrial de Puerto Rico. El 1 de enero de 1952 la Hilton formalizó un "Contrato de Concesión" con Louis Talbert mediante el cual éste se haría cargo de la ope-

ración por un término de dos años de una tienda de efectos para caballeros en cierto local en el edificio del hotel. Un "Contrato Complementario" fechado el 26 de octubre de 1953 disponía que el contrato expiraría el 30 de noviembre de 1954 a menos que por convenio mutuo fuera renovado. El 20 de julio de 1954 la Hilton le escribió a Talbert al efecto de que no era su intención renovar el contrato y solicitaba de él que desocupara el local.

El 21 de septiembre de 1954 Talbert radicó demanda contra la Hilton en el Tribunal Superior solicitando (1) sentencia declaratoria al efecto de que aun cuando el contrato expiraría el 30 de noviembre de 1954, el mismo debía ser ". . . prorrogado obligatoriamente . . ." a opción de Talbert en virtud del art. 12 de la Ley de Alquileres Razonables, y (2) que se dictaran un *injunction* preliminar y uno permanente prohibiéndole a la Hilton o a sus empleados entorpecerlo en el uso y disfrute de la tienda. Talbert acompañó a su demanda como *exhibits* el Contrato de Concesión, el Contrato Complementario y la correspondencia cursada entre las partes en relación con la terminación del contrato.

Talbert también radicó una solicitud por separado para que se dictara un *injunction* preliminar al mismo efecto. La Hilton radicó contestación oponiéndose a la solicitud de *injunction* preliminar. Acompañó a la referida contestación como exhibits (1) copia de un Contrato de Concesión, de fecha 4 de agosto de 1954, formalizado entre la Hilton y un nuevo concesionario para que éste operara la tienda de efectos para caballeros aquí envuelta empezando el 1 de diciembre de 1954 y terminando el 30 de septiembre de 1956, con términos sustancialmente similares a los contenidos en el Contrato de Concesión celebrado entre la Hilton y Talbert, y (2) copia de una carta de fecha 22 de octubre de 1954 del Jefe de la División Legal de la Oficina de Estabilización Económica de Puerto Rico en la cual éste, en respuesta a una carta de la Hilton del 18 de octubre de 1954, llegaba a la conclusión que ". . . la relación entre Louis Talbert, como inquilino y Hilton

Hotels Corporation, no está cubierta por la Ley de Alquileres Razonables según la excepción del Artículo 4 de dicha ley . . ." A la luz de la solicitud de *injunction* preliminar, de la contestación a la misma y de los exhibits acompañados a ambas, el Tribunal Superior, luego de oír a las partes, dictó resolución concediendo un *injunction* preliminar según lo había solicitado Talbert. La Hilton ha apelado contra esta resolución.

Las contenciones de las partes hacen conveniente que se haga un resumen de los términos de su contrato. En la parte expositiva preliminar del contrato se dice que el mismo es un contrato de concesión formalizado entre la Hilton y Louis Talbert, haciendo negocios como Timothy Talbert Shop, y descrito como "el concesionario". Sigue diciendo el contrato que "en dicho hotel existe una tienda de efectos para caballeros . . . *para la conveniencia de los huéspedes,* y la Hilton y el concesionario han convenido en que a partir del 1 de enero de 1952 el concesionario se hará cargo de la operación de dicha tienda . . ." (Bastardillas nuestras.)

La cláusula 1-A dispone que Talbert suministrará ". . . toda la supervisión, trabajo y materiales necesarios para operar en el hotel y en el local mencionado más adelante una tienda para la venta de efectos para caballeros de la más alta calidad. *Tal tienda será operada conforme a las normas establecidas por la Hilton para la operación del hotel,* y tendrá disponibles para la venta efectos para caballeros de la clase y calidad que se encuentra de ordinario para la venta en las mejores tiendas de la ciudad de Nueva York (tales como Brooks Brothers y A. Sulka and Co.)." (Bastardillas nuestras.) Además de esta descripción de lo que Talbert puede vender en su tienda, la cláusula 1-A enumera los productos que no puede vender: perfumería, joyería, efectos deportivos y efectos que de ordinario vende el bazar o el puesto de periódicos y de productos farmacéuticos. Y en la cláusula 1-B la Hilton conviene en no permitir la venta de efectos para caballeros en ninguna otra tienda en el hotel.

La cláusula 2 dispone que el término de duración del contrato será de dos años, empezando el 1 de enero de 1952, y puede prorrogarse por dos años más siempre y cuando que: ". . . se llegue a un arreglo satisfactorio entre las partes según se dispone en la cláusula 3 de este contrato." [1]

La cláusula 3 dispone que Talbert pagará a la Hilton anualmente o (1) el 10% de los primeros $40,000 de sus ventas brutas anuales más el 5% de las ventas brutas anuales en exceso de $40,000, o (2) $2,700 anuales, cualquiera de dichas cantidades que fuere la mayor, "como compensación por los privilegios que aquí se le conceden . . .". Según la Hilton indica en su alegato, en ningún sitio el contrato se refiere a esta compensación como "canon de arrendamiento".

La cláusula 4 prohibe a Talbert la cesión del contrato sin el consentimiento de la Hilton y dispone que Talbert supervisaría *personalmente* el cumplimiento de las obligaciones asumidas por él bajo el contrato. La cláusula 5 dispone que el nombre de la tienda será aprobado por la Hilton por escrito y será propiedad de la Hilton con la excepción de que "si el concesionario decide usar el nombre 'Timothy Talbert Shop', no será necesario que la Hilton lo apruebe quedando propiedad del concesionario el referido nombre." La cláusula 6 dispone que los empleados del concesionario deberán merecer la aprobación de la Hilton.

La cláusula 7-A dispone que la Hilton podrá periódicamente inspeccionar la tienda, el servicio que se presta a los parroquianos y los libros y récords de Talbert.

La cláusula 8 dispone: "La Hilton continuará poniendo a disposición del concesionario el local ocupado actualmente por la tienda y de tiempo en tiempo, según lo exijan las necesidades del negocio del concesionario, proveerá a éste local para

[1] Aparentemente hay un error de maquinilla en los autos ante nos en cuanto a la fecha de terminación del Contrato de Concesión que aparece como diciembre 31, 1954. Pero como convenio por dos años el mismo expiró en diciembre 31, 1953. Poco antes de esta segunda fecha, en octubre 26, 1953, las partes formalizaron un Contrato Complementario que prorrogó su contrato hasta noviembre 30, 1954.

almacén en el hotel; pero no estará obligada a suministrar más de 200 pies cuadrados de almacén en ninguna ocasión. La Hilton proveerá, sin costo adicional al concesionario, la corriente eléctrica y el agua necesarias para la operación de la tienda; y hará todo el trabajo de pintura y de reparaciones estructurales en la tienda por su cuenta. En caso de que el área comercial en el hotel deba reconstruirse o revisarse durante el término de este contrato, la Hilton proveerá al concesionario local adecuado en el área comercial así reconstruída o revisada."

La cláusula 9 dispone el pago por Talbert a la Hilton de $1,100 en pagos mensuales de $100 para cubrir el costo de la instalación por la Hilton de ". . . vitrinas de madera y cristal, que son y seguirán siendo propiedad de la Hilton". La cláusula 10 dispone que los gastos de operación y mantenimiento de la tienda serán por cuenta del concesionario; la cláusula 11 exige que Talbert se provea de todas las licencias y permisos y pague todas las contribuciones exigibles para la operación de la tienda; la cláusula 12 dispone que todos los riesgos en relación con la operación de la tienda, incluyendo compensaciones por accidentes del trabajo, lesiones personales y fuego, serán asumidos por Talbert.

La cláusula 13 dispone lo siguiente: "El decorado de la tienda estará sujeto a la aprobación de la Hilton. El concesionario no hará cambios en el mismo sin la aprobación previa por escrito de la Hilton; así como tampoco tendrá derecho a instalar anuncios o material para anuncios en el local del hotel, bien sea dentro o fuera de la tienda, sin la aprobación previa por escrito de la Hilton."

La cláusula 14 dispóne en parte lo siguiente: "De elegirlo así el concesionario, la Hilton facturará a los huéspedes del hotel por los efectos comprados en la tienda, pero no será responsable al concesionario por cualquier pérdida que resulte del no pago de las cuentas. La Hilton no será responsable del cobro de ninguna cuenta en controversia."

La cláusula 15 le reserva a cada parte el derecho a terminar el contrato en caso de insolvencia, quiebra o sindicatura de la otra parte.

Las cláusulas 16, 17 y 18 proveen como sigue:

"16—*Siendo éste un contrato para adquirir los servicios personales y habilidad del concesionario para la operación y desarrollo de la tienda,* se conviene en que la Hilton puede terminar el mismo, previa notificación al concesionario, en cualquier momento en que determine que el concesionario no está operando la tienda de conformidad con las normas establecidas por la Hilton para la operación del hotel y/o no está cumpliendo con uno o más de los términos y disposiciones de este contrato; disponiéndose, sin embargo, que antes de la terminación de este contrato, la Hilton notificará al concesionario por escrito de la deficiencia o falta advertida y le concederá un término de treinta días para corregir tal deficiencia o falta. La terminación a tenor con la cláusula 15 de este contrato puede consumarse mediante notificación por escrito y será efectiva al momento en que se efectúe la notificación de terminación.

"17—*En caso de que la Hilton decida terminar este contrato, con o sin justificación, se conviene en que el concesionario trasladará inmediatamente y/o hará que se trasladen todas sus pertenencias de la tienda, y hará entrega del local a la Hilton,* renunciando por la presente a cualquier derecho que pueda tener de permanecer en posesión del local y de seguir haciendo negocios en la tienda hasta que se determine en definitiva si la terminación del contrato por la Hilton fué o no legal. La entrega por el concesionario de la tienda a la Hilton en tal caso no se considerará como que constituye una admisión por el concesionario de que la tienda no se operaba de conformidad con los términos y disposiciones de este contrato, o que el concesionario no cumplió con alguno de los términos y disposiciones del mismo. *Se conviene y se acuerda, sin embargo, que el único remedio del concesionario, en caso de que pueda creer que la Hilton ha terminado el contrato ilegalmente o sin justificación, será una acción para recobrar aquellos daños y perjuicios a que el concesionario crea tener derecho.*

"En caso de terminación por cualquier motivo, si el concesionario no trasladare o se negare a trasladar sus pertenencias de la tienda, la Hilton tendrá derecho a que las mismas sean trasladadas y almacenadas por cuenta y a riesgo del concesionario; y

en tal caso, la Hilton no será responsable al concesionario por cualquier daño o perjuicio ocasionado con motivo de tal traslado o almacenaje de dichas pertenencias del concesionario.

"18—*Este contrato no se considerará que es un arrendamiento o subarrendamiento de ninguna parte del hotel, sino un contrato para la prestación por el concesionario de ciertos servicios que se estiman necesarios y/o convenientes para la comodidad y atención de los huéspedes del hotel, los cuales servicios el concesionario está singularmente capacitado para prestar* y el concesionario por la presente expresamente reconoce y conviene en que no tiene derecho a los beneficios de las disposiciones de la Ley núm. 464 de la Asamblea Legislativa de Puerto Rico, aprobada el 23 de abril de 1947,([2]) conocida como la 'Ley de Alquileres Razonables', según ha sido enmendada, o a los beneficios de ninguna otra ley que actualmente sea aplicable o pueda ser aplicable a los derechos de arrendatarios de bienes inmuebles." (Bastardillas nuestras.)

La cláusula 21 dispone el pago de $5 mensuales a cuenta ". . . del costo de instalación y operación del sistema de aire acondicionado instalado en relación con el local de la tienda."

En la cláusula primera del Contrato Complementario del 26 de octubre de 1953 las partes modificaron el contrato original prorrogándolo hasta el 30 de noviembre de 1954. La cláusula segunda dispone en parte que "a partir del 1ro. de enero de 1954, la compensación que el concesionario pagará a la Hilton por el privilegio que se le concedió en el contrato original, será una suma igual al 10% de las ventas brutas de la tienda, o la suma de $225 mensuales, cualquiera de las dos que fuere la mayor."([3])

El Contrato Complementario también proveía que ". . . cada parte notificará a la otra, en o antes del día 1ro. de

---

([2]) La Ley de Alquileres Razonables es la núm. 464, Leyes de Puerto Rico, 1946 ((1) pág. 1237).

([3]) Luego en el segundo párrafo la mensualidad es mencionada como de $285. Esto parece ser otro error de maquinilla en los autos ante nos. El Contrato de Concesión original proveía un pago anual de $2,700—es decir, $225 mensuales—y el único cambio en el Contrato Complementario en cuanto a la compensación aparentemente fué en el por ciento de las ventas brutas a ser pagado a la Hilton si fuere en exceso de los pagos mensuales.

septiembre de 1954, de su deseo de considerar o no una nueva prórroga del contrato original. Tal notificación en forma alguna obligará a la otra parte, y ninguna de las partes que notificare su deseo de prorrogar el contrato vendrá obligada a ello, siendo la voluntad de las partes que tal notificación sirva simplemente de guía a fin de hacerle posible a la otra parte hacer planes para una nueva prórroga del contrato o para su terminación."

I

■ El art. 12 de la Ley de Alquileres Razonables dispone que cuando expira un contrato de arrendamiento de locales comerciales, el mismo se ". . . prorrogará obligatoriamente . . ." a opción del arrendatario.([4]) El Tribunal Superior resolvió que el Contrato de Concesión aquí envuelto es un contrato de arrendamiento de un local comercial; que en su consecuencia el mismo fué ". . . prorrogado obligatoriamente . . ." a tenor con el art. 12 cuando Talbert hizo uso de su opción para permanecer en posesión de la tienda cuando venciera el contrato; y que Talbert tenía derecho a un *injunction* preliminar para impedirle a la Hilton que lo perturbara en la posesión y uso de la tienda.

La Hilton impugna esta decisión. Sostiene que el art. 12 no es aplicable a este caso por el fundamento de que el Contrato de Concesión no es un arrendamiento. Más bien, según la Hilton, el contrato es uno de servicios personales que incidentalmente requiere el uso del local en cuestión. En apoyo de su contención, la Hilton descansa en varias de las disposiciones del contrato.

Comienza la Hilton por llamar la atención hacia el hecho de que el contrato no está concebido en términos de "arrendamiento" y "canon", que de ordinario son empleados en los contratos de arrendamiento. Por el contrario, las partes

---

([4]) Ley núm. 464, Leyes de Puerto Rico, 1946, según fué enmendada por la Ley núm. 201, Leyes de Puerto Rico, 1948 ((1) pág. 575); 17 L.P.R.A. sec. 192.

expresamente convinieron en que el contrato sería uno de servicios personales. La Hilton admite que el nombre que se le dé a un contrato no es decisivo si de sus términos surge un resultado diferente, véase *Vélez* v. *San Miguel*, 68 D.P.R. 575; pero, citando a *Mejías, Administrador* v. *Tribunal Superior*, 75 D.P.R. 447, 452, la Hilton arguye que el nombre que las partes den a un contrato juega un papel muy importante aquí, especialmente a la luz de las otras disposiciones del contrato.

Continúa sosteniendo la Hilton lo siguiente: El objetivo principal del contrato no fué el cobro de cánones. Fué el de rendirle un servicio a los huéspedes del hotel dándole a Talbert acceso a ellos. La Hilton opera un gran y moderno hotel para turistas en el cual debe prestar varios servicios que requieren sus exigentes huéspedes, incluyendo una tienda de efectos para caballeros. Al hacer arreglos para que Talbert prestara estos servicios en lo que se refería a efectos para caballeros, la Hilton no estaba meramente interesada en dar en arrendamiento un local que está "en el corazón del propio hotel" por un canon estipulado; hubiera así actuado solamente si se hubiese dedicado al negocio de arrendar locales y sólo estuviese interesada en obtener cánones de arrendamiento. La Hilton no se limita a suministrar un local vacío; le proporciona a Talbert su clientela para la cual Talbert a cambio contrata con el hotel a fin de prestarle el servicio adecuado.

La Hilton afirma que, al ofrecer a Talbert y a otros concesionarios en la misma situación, un gran número de clientes deseables concentrados en un solo sitio, en efecto dijo: "Tenemos una clientela ideal concentrada en un edificio y deseamos darle toda clase de servicios, pero preferimos hacerlo a través de personas particularmente capacitadas para ello. ¿Desea usted prestar uno de esos servicios, dividiendo las ganancias con nosotros? Naturalmente, necesitaremos el uso de algún espacio en el hotel para el negocio y lo supliremos, pero nos reservaremos ciertos derechos y controles sobre el negocio, y le aclaramos desde ahora que no le estamos arrendando un

local." Eso, alega la Hilton, es muy diferente a decir: "Le alquilo este local por tal precio por tanto tiempo."

En apoyo de su tesis de que esto no es un arrendamiento, la Hilton indica que se ha reservado una serie de derechos y controles sobre el negocio de Talbert en cuestiones tales como el nombre de la tienda, el personal, la supervisión, el decorado, la clase de mercancía, etc. Según la Hilton, tales términos ni son característicos de ni se permiten en un arrendamiento corriente.

La cláusula 8 del contrato dispone un cambio en el local de la tienda para caballeros en caso de que el área comercial del hotel deba "reconstruirse o revisarse". De conformidad con la Hilton, esto demuestra que el local específico en que esté establecida la tienda dentro del hotel no tiene importancia, pero que las partes sólo estaban interesadas en ofrecerle a los huéspedes acceso a la tienda para caballeros en algún sitio dentro del hotel. Y tal arreglo, insiste la Hilton, no es un arrendamiento.

La Hilton arguye que el aplicar el art. 12 al Contrato de Concesión equivaldría a intervenir con una relación personal en la cual la Hilton descansa en la capacidad, la destreza y la integridad del concesionario que rinde a solicitud de la Hilton ciertos servicios necesarios dentro del hotel a los huéspedes; que servicios inadecuados rendidos por los concesionarios harían daño a la reputación de la Hilton, ya que los huéspedes atribuirían tales deficiencias al propio hotel; y que si la Hilton se ve impedida por el art. 12 de dar por terminado o de negarse a prorrogar un contrato de concesión, se vería obligada ella misma a operar las varias concesiones en el hotel, cosa que no convendría a todos los interesados.

La Hilton alega que bajo el art. 1207 del Código Civil, ed. de 1930, el Contrato de Concesión es un contrato válido, ya que no está contra el orden público y nada hay en nuestras leyes que impida el reconocimiento de esta nueva y moderna clase de contrato, véanse *P. R. Auto Corporation* v. *Tribunal de Contribuciones*, 77 D.P.R. 114; *Rivera* v. *Sucn. Díaz*,

70 D.P.R. 181, 200–201, (opinión concurrente). Al sostener que el Contrato de Concesión no es un arrendamiento al cual le sea aplicable el art. 12, la Hilton lo describe como sigue: "A nuestro juicio dicho convenio no constituye un arrendamiento aunque contiene elementos de aquél. Es más bien un convenio de servicios personales en el cual incidentalmente se usa un local, siendo la relación entre las partes, en cuanto al uso del local concierne, la llamada en inglés 'licensor-licensee', y tiene algunas características de una empresa común (*joint venture*) y de una sociedad (*partnership*). En realidad es un contrato *sui generis* y debe aceptarse, tratarse y catalogarse como tal, para no frustrar la función que debe desempeñar en nuestra vida comercial moderna."

En apoyo de su contención de que el Contrato de Concesión no debe tratarse como un arrendamiento sino como un contrato *sui generis* o como una relación de "cedente-cesionario", la Hilton cita *Comments, Contracts—Agreements for Leasing Departments in Retail Stores*, 35 Mich.L.Rev. 95, 101, 108; 33 Am. Jur. 398; *Hess* v. *Roberts*, 108 N.Y. Supp. 894 (1908) (el privilegio exclusivo de la oficina del taquígrafo público en un hotel no es un arrendamiento); *Planetary Recreations* v. *Kerns, Inc.*, 54 N.Y.S. 2d 418 (1945) (la concesión en un club nocturno para cigarrillos, retratos, vestidor y guardarropía es una "licencia" y no un "contrato para el uso o arriendo de bienes inmuebles"); *Criterion Concessions* v. *Jelin Productions*, 61 N.Y.S.2d 239 (1946) (el privilegio para vender dulces y para guardarropía en un teatro convirtió a la demandante en una concesionaria y no en una arrendataria); *Halpern* v. *Silver*, 65 N.Y.S.2d 336 (1946) (el permiso para instalar y operar una lavadora de alquiler en un edificio es una licencia, no un arrendamiento); *Kaypar Corporation* v. *Fosterport Realty Corp.*, 69 N.Y.S.2d 313 (1947) (el convenio bajo el cual la demandante instaló y operó lavadoras de alquiler en el sótano de un edificio de apartamientos no protegía a la demandante de un desahucio bajo la Ley sobre Control de Alquileres Comerciales de Nueva

York) ; *Schusterman* v. *C.&.F. Caterers*, 77N.Y.S.2d 718 (1948) (la concesión para guardar sombreros y abrigos es una licencia y no un arrendamiento y no la cubre la Ley de Emergencia sobre Control de Alquileres de Nueva York, que protege la posesión de espacio y no una licencia para llevar a cabo ciertas transacciones en bienes inmuebles) ; *Wash-O-Matic Laundry Co.* v. 621 *Lefferts Ave. Corp.*, 82 N.Y.S.2d 572 (1948) (el convenio sobre lavadoras es licencia, no arrendamiento) ; *Layton* v. *A.I. Namm & Sons*, 89 N.Y.S.2d 72 (1949) (el convenio mediante el cual un óptico consiguió cierto local para el despacho de productos de óptica en una tienda al detal es una licencia, no un arrendamiento) ; *Tel-Hotel Corp.* v. *Lexnott Corp.*, 124 N.Y.S. 2d 159 (1953) (el derecho a instalar equipo de televisión en las habitaciones de un hotel es una licencia más bien que un arrendamiento.) (⁵)

Por el otro lado Talbert, citando el caso de *Figueroa* v. *Rodríguez*, 68 D.P.R. 266, arguye que de conformidad con nuestro Código Civil el privilegio de usar determinado bien inmueble por un precio cierto crea la relación de arrendador y arrendatario. Afirma que en vista de la definición de "el arrendamiento de cosas" en el art. 1433 del Código Civil, ed. de 1930, y de los amplios términos del párrafo 7 del art. 22 de la Ley de Alquileres Razonables, según fué enmendada por la sec. 3 de la Ley núm. 201 de 1948, el Contrato de Concesión está cubierto por dicha Ley. (⁶) Analiza las varias cláusulas

(⁵) Debe indicarse que en algunos de estos casos de Nueva York no estaba envuelta la cuestión de desahucio; en otros, distintos al presente, el "cesionario" no tenía derecho a la posesión exclusiva de un local específico. En cuanto a si los tribunales de Nueva York desahuciarían a un demandado que tenía derecho bajo su contrato, como en el presente caso, a la posesión exclusiva de un local específico, *quaere. Cf. Shepard Warehouses* v. *Scherman*, 63 N.Y.S., 2d 421 (1946), en que un "cesionario" fué considerado como un "inquilino estatutario" y por consiguiente protegido por la ley de Nueva York sobre control de alquileres, aun cuando sólo tenía una licencia, y no un arrendamiento, para guardar 14 camiones en un garaje a tanto mensual por camión.

(⁶) El art. 1433 dispone lo siguiente: "En el arrendamiento de cosas, una de las partes se obliga a dar a la otra el goce o uso de una cosa por tiempo determinado y precio cierto."

El párrafo 7 provee: " 'Contrato', 'Arriendo' y 'Arrendamiento' in-

del mismo para demostrar su argumento. Indica, según admite la Hilton, que si la Ley de Alquileres Razonables es de aplicación, la cláusula en el contrato eximiéndolo de la misma es nula. Y cita *In re Owl Drug Co.*, 12 F.Supp. 439 (Dist. Ct., Nev., 1935); *Hotel Markhan* v. *Patterson*, 32 So.2d 255 (Miss., 1947) y *Shepard Warehouses* v. *Scherman*, supra.

El Tribunal Superior convino con Talbert. Resolvió que el contrato era uno de arrendamiento de cosa, y no de servicios, según dispone el art. 1433 del Código Civil, por el fundamento de que ". . . cedió al demandante por término fijo y precio cierto un local determinado específicamente para ser destinado a la venta de ropa para caballeros." Y, según el tribunal sentenciador, los derechos que se reservó la Hilton no alteraron la naturaleza del contrato.

Este problema surge en esta jurisdicción por primera vez. Envuelve una cuestión bastante cerrada que, como proposición general, concebiblemente requiera una contestación diferente en el derecho civil frente a la ley común. Los casos y los autores indican que en la ley común la línea divisoria entre un arrendamiento y una licencia puede llegar a ser muy difícil de determinar.(7) Lo más importante es que el caracterizar el Contrato de Concesión aquí envuelto bien como arrendamiento o bien como "licencia" puede llegar a tener implicaciones de vasto alcance en otros campos del derecho

---

cluyen todo contrato de arrendamiento y todo convenio verbal o escrito en virtud del cual el dueño cede al inquilino el uso de una propiedad de alquiler o una parte de la misma por precio cierto."

(7) En adición a las autoridades citadas por las partes en sus alegatos en cuanto a la naturaleza de una licencia comparada con un arrendamiento, véanse 2 Powell, *Real Property*, págs. 175-7, y casos citados en escolios 25-31; 3 Ibid., págs. 524-5, págs. 514 *et seq.*; I *American Law of Property*, pág. 202, págs. 177 *et seq.*; *Pitts* v. *Cincinnati Metropolitan Housing Authority*, 113 N.E.2d 869 (Ohio, 1953); *Taylor* v. *Dean*, 78 A.2d 382 (D.C., 1951); *Kaiser Co.* v. *Reid*, 184 P.2d 879, 885; (Cal., 1947); *Rendall* v. *Pioneer Hotel*, 222 P.2d 986, 989 (Ariz., 1950); *Gerould Co.* v. *Arnold Constable & Co.*, 65 F.2d 444 (C.A. 1, 1933); *Tips* v. *United States*, 70 F.2d 525 (C.A. 5, 1934); *Beckett* v. *City of Paris Dry Goods Co.*, 96 P. 2d 122 (Cal., 1939); 51 C.J.S. 513, *Cf. Galiñanes Hnos.* v. *Tribunal Superior*, 77 D.P.R. 881 (1955).

como en el contributivo, en el de daños y perjuicios y en el de quiebra. Bajo estas circunstancias, preferimos dejar abierta la cuestión de si el convenio entre la Hilton y Talbert, como cuestión de derecho general, constituyó un arrendamiento en vista del resultado a que llegamos en la Parte II de esta opinión bajo los términos específicos de la Ley de Alquileres Razonables.(8)

## II

██ ██ Seguidamente la Hilton alega que aun suponiendo que el Contrato de Concesión fuera un arrendamiento, el art. 4 de la Ley de Alquileres Razonables expresamente excluye de la Ley el arrendamiento de un local dentro de un hotel para la operación de negocios tales como una tienda de efectos para caballeros que le sirve a los huéspedes del hotel.

El art. 4 de la Ley núm. 464 de 1946 originalmente disponía en parte como sigue: "Tampoco se aplicarán las disposiciones de esta Ley a hoteles ni a casas de hospedajes que provean alojamiento y comida al mismo tiempo." Dicho artículo fué enmendado por la Ley núm. 395, Leyes de Puerto Rico, 1947 ((1) pág. 757), para que dispusiera así: "Tampoco se aplicarán las disposiciones de esta Ley a hoteles ni casas de hospedaje en cuanto a la relación entre quien ex-

---

(8) Aun cuando el art. 12 no lo dispone expresamente, hemos resuelto que el mismo no es de aplicación a—y por tanto no lo prorroga obligatoriamente—un arrendamiento de un negocio en marcha, aun cuando el arrendamiento incidentalmente incluya el edificio en que se encuentra establecido el negocio. *Orsini* v. *Sánchez,* 67 D.P.R. 863; *Ortiz* v. *Cesaní,* 68 D.P.R. 412. *Cf Sucesión Ramírez* v. *Corte,* 70 D.P.R. 799; *Mejías, Administrador* v. *Tribunal Superior,* supra. La Hilton arguye que también debiéramos resolver aquí que cuando se formalizó el Contrato de Concesión ya existía un negocio en marcha y que el local envuelto era sólo incidental al mismo. Nuevamente ahora, en vista del resultado a que hemos llegado en la Parte II bajo los términos de la Ley, es innecesario basar nuestra decisión en estos casos. Por tanto, no nos detendremos a determinar si los hechos un poco diferentes—incluyendo la circunstancia de que, en vez de arrendarle a la Hilton un negocio en marcha, el propio Talbert originalmente montó el negocio—requerirían un resultado diferente en este caso.

plota dicho negocio de hotel o casa de hospedaje y sus huéspedes o inquilinos." (⁹)

El Tribunal Superior resolvió que la excepción contenida en el art. 4 no es de aplicación a todo arrendamiento que un hotel haga de parte de su local; que, por el contrario, esta excepción sólo se aplica a actividades que son propias de un hotel; y que tales actividades propias están limitadas a arrendarle habitaciones o apartamientos a los "huéspedes" que permanecen en el hotel por períodos cortos y a los "inquilinos" que hacen de un hotel—mediante una tarifa más baja—sus residencias permanentes. (¹⁰)   El tribunal sentenciador admitió que un hotel de turismo no puede ser operado con éxito si las personas que se quedan en él—ya "huéspedes" por cortos períodos o ya "inquilinos" a largo plazo—tuvieran la protección de la Ley de Alquileres Razonables. (¹¹)   Pero asumió la posición de que en este caso se imponía un resultado diferente bajo la teoría de que la Asamblea Legislativa tuvo por miras en la excepción del art. 4 cubrir solamente aquellas actividades propias del negocio de hotel y que la operación de una tienda de efectos para caballeros no era una actividad propia de hotel. El tribunal sentenciador afirmó que la situación en este caso es la misma que si el local hubiera sido arrendado a un médico; que esto hubiera beneficiado al hotel como un servicio adicional para sus huéspedes; pero que excluir la relación entre el médico y el hotel de la Ley de Alquileres Razonables equivaldría a privar al médico de la protección conferídale por la Ley a otros médicos cuyas oficinas radiquen en otros edificios.

---

(⁹) Hemos sustituído la palabra "guest" por "lodger" en el texto en inglés del art. 4, según fué enmendado en 1947, como una mejor traducción, en el contexto del art. 4, de la palabra "huésped" del texto en español.

(¹⁰) En apoyo de su distinción entre "huéspedes", que permanecen en un hotel por corto tiempo, e "inquilinos" a largo plazo, el tribunal sentenciador citó 18 *Words and Phrases, Ed.* Perm., págs. 849–50, y *Hackett,* v. *Bell Operating Co.,* 169 N.Y.Supp. 114, 115 (1918). Véase también *Hunddley* v.` *Milner Hotel Management Co.,* 114 F.Supp. 206 (Dist.Ct.,Ky.;1953).

(¹¹) Estamos de acuerdo.   No puede haber duda del derecho de un hotel, de así elegirlo, a desahuciar inmediatamente tanto a los huéspedes por corto tiempo como a los de largo plazo, que intenten permanecer en el

El Tribunal Superior determinó por sí mismo el significado de la palabra "inquilino" en el art. 4, según fué enmendado en 1947. Llegó a la conclusión de que el término "inquilino" era virtualmente sinónimo de "huésped", con la única diferencia de que el primero era más o menos un huésped permanente con una tarifa menor. Pero cuando un estatuto define claramente un término, esa definición es la que debe prevalecer; no incumbe a los tribunales especular que la Asamblea Legislativa pudo haber tenido el propósito de usar el término en un sitio en el estatuto en un sentido diferente o limitado. 2 Sutherland, *Statutory Construction*, tercera edición, 222; Crawford, *Statutory Construction*, págs. 361–3; 50 Am. Jur. 254–5; 82 C.J.S. 536–8. A tenor con este principio general, hemos resuelto que las definiciones de términos halladas en la Ley de Alquileres Razonables son las que imperan. *Cintrón* v. *Corte Municipal*, 67 D.P.R. 793, 795–6; *La Costa* v. *Tribunal de Distrito*, 67 D.P.R. 171; *Mejías, Administrador* v. *Tribunal Superior*, supra, 455.

▪ De conformidad con lo antes expuesto, pasemos a la Ley y a las definiciones contenidas en la misma. El art. 4, según fué enmendado en 1947, excluyó de la Ley "la relación entre quien explota dicho negocio de hotel . . . y sus huéspedes o *inquilinos*." (Bastardillas nuestras.) · ¿Qué es un "inquilino"? Dicho término se define en el art. 22 de la Ley núm. 464 de 1946, como sigue: " 'Inquilino' incluye arrendatario, subarrendatario y persona natural o jurídica que habite, *use u ocupe una propiedad de alquiler*." (Bastardillas nuestras.) (¹²) El propio Talbert sostiene que él tiene un arrendamiento de un local comercial. (¹³) Por consiguiente parece

hotel más allá del período cubierto por sus reservaciones. Solamente en esta forma puede un hotel honrar las reservaciones de huéspedes futuros y con ello mantener su reputación.

(¹²) No obstante haber la sec. 3 de la Ley núm. 201 de 1948 enmendado el art. 22 en otros respectos, dejó sin cambio alguno la definición de "inquilino".

(¹³) El art. 22 también dispone: " 'Propiedad de Alquiler' incluye . . . casa y edificación que se use en todo o en parte para negocios. . . o propósitos comerciales o industriales."

obvio que bajo su propia teoría Talbert es un *inquilino* que usa u ocupa propiedad de alquiler según se define en el art. 22. Y el art. 4 excluye de la Ley un *"inquilino"* de un hotel.

Nuestro criterio se refuerza por el historial de la Ley de Alquileres Razonables. El art. 4, según disponía originalmente en 1946, excluía de la Ley ". . . hoteles [y] casas de hospedaje *que provean alojamiento y comida."* (Bastardillas nuestras.) Esto aparentemente limitó la excepción a huéspedes. El art. 2(*b*) del Reglamento de Inquilinato para Locales Comerciales, promulgado el 1ro. de noviembre de 1946, también se limitaba a huéspedes. Disponía el mismo que el Reglamento no sería aplicable a: "Hoteles y casas de hospedaje en cuanto a la relación entre quien explota dicho negocio y los huéspedes y pasajeros." Pero la Asamblea Legislativa en 1947, al enmendar el art. 4, amplió la excepción para que incluyera "inquilinos" del hotel. Tanto las disposiciones de la Ley de 1946 como el art. 2(*b*) del Reglamento fueron por consiguiente suplantados en cuanto a la cuestión ante nos. Los "inquilinos" de un hotel, según se definen en el art. 22 —que claramente incluyó al arrendatario de una tienda de efectos para caballeros a fin de darle servicio a los huéspedes— fueron desde entonces excluídos de la Ley. Aun cuando, desde luego, no nos obliga la opinión del Jefe de la División Legal de la Oficina de Estabilización Económica a este efecto, convenimos con ella.

Para poder eludir la lógica inexorable de la definición del art. 22, como éste se aplica a la excepción de los inquilinos de hoteles en el art. 4, Talbert sostiene y el Tribunal Superior convino con él en que el término "inquilino" en el art. 4 significa solamente aquéllos que son huéspedes a largo plazo del hotel. En primer lugar, la definición hallada en el art. 22 y la disposición en el art. 4 no contienen tal limitación. Nada encontramos en la definición del art. 22 ni en el art. 4 que diga que los términos "huésped" e "inquilino" son virtualmente sinónimos. Por consiguiente es nuestro deber aplicar la ley según fué escrita a un "inquilino" de un hotel como lo es

Talbert. En segundo lugar, aun cuando el estatuto hubiera limitado la excepción a inquilinos en relación con actividades propias de un hotel, no podemos convenir en que la operación de esta tienda específica de efectos para caballeros en el Hotel Caribe Hilton no sea una actividad propia de un hotel de turismo. Por el contrario—aun cuando llamásemos arrendamiento el convenio entre las partes—el Contrato de Concesión demuestra de su faz que ambas partes deseaban ofrecer a los huéspedes de este lujoso hotel de turismo los servicios que se encuentran en una tienda de primera categoría de efectos para caballeros.

Aparentemente el Tribunal Superior fué del criterio de que un hotel de turismo limita sus actividades a proporcionar alojamiento y comidas a sus huéspedes. Ningún hotel de turismo sobreviviría mucho tiempo bajo tal teoría. La Hilton, que opera una cadena de hoteles en todo el mundo, sabía esto. Tuvo cuidado en formalizar un contrato cuyos términos, según se resumen más arriba, demuestran inequívocamente que la tienda de efectos para caballeros era parte integral de las facilidades que la Hilton ofrece a sus huéspedes como hotel de turismo. No vemos con qué autoridad podemos *por un mero ipse dixit* variar los términos del contrato al cual tanto la Hilton como Talbert específicamente concurrieron, y resolver que tales servicios no son una actividad propia de un hotel de turismo. ([14])

Resolvemos que, de conformidad con el art. 4 de la Ley de Alquileres Razonables, el contrato entre la Hilton y Talbert para la operación por éste de una tienda de efectos para caballeros en un local del Hotel Caribe Hilton no está cubierto por

---

([14]) No está ante nos y nada comentamos sobre la cuestión de si un hotel puede valerse de la excepción en el art. 4 para desahuciar a un "inquilino" de un local comercial que no tiene conexión alguna con la prestación de servicios que de ordinario los huéspedes esperan de un hotel de turismo. Por consiguiente es innecesario discutir el ejemplo del médico que ofrece la opinión del tribunal sentenciador o de algún otro "inquilino" bajo circunstancias similares.

dicha Ley y que, en consecuencia, el referido contrato no quedó prorrogado obligatoriamente a opción de Talbert a tenor con el art. 12. ($^{15}$)

*La resolución del Tribunal Superior dictando un injunction preliminar a favor de Talbert será revocada y se devuelve el caso.*

---

($^{15}$) El caso de *Mejías, Administrador* v. *Tribunal Superior,* supra, que resuelve que el art. 4 no excluye de la Ley un arrendamiento de todo un hotel, es desde luego distinguible del presente.  Nuestro lenguaje a la pág. 455 del caso de *Mejías* en relación con el art. 4 no tiene relación alguna con el problema aquí envuelto.